IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JUAN RAMON RODRIGUEZ,

     Petitioner,

  vs.

MARION SPEARMAN, Warden,
Correctional Training Facility,[1]

     Respondent.

No. 2:12-cv-01923-JKS

MEMORANDUM DECISION

  Juan Ramon Rodriguez, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Rodriguez is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Correctional Training Facility in Soledad, California. Respondent has answered, and Rodriguez has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

  On April 30, 2009, Rodriguez was charged with one count of rape of a child under the age of fourteen by a person more than ten years older than the victim and three counts of lewd and lascivious acts on a child under the age of fourteen. On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying the indictment:

*Prosecution Evidence*
  On February 3, 2001, Ashley T. was 11 years old—about the same age as her friend Antonia. That evening, Ashley and Antonia went to a sleepover at the apartment of their friend, Blanca. The girls watched movies before turning out the lights and going to sleep at approximately 11:00 p.m.

---

[1]  Marion Spearman, Warden, Correctional Training Facility, is substituted for R. Diaz, former Warden, California Substance Abuse Treatment Facility and State Prison, Corcoran. FED. R. CIV. P. 25(c).

Ashley fell asleep on a couch in the living room.  She was wearing pajamas with a drawstring and a tank top.  She had covered herself with a blanket.  Sometime after midnight, [Rodriguez] woke her up and told her to turn the lights off.  [Rodriguez] is Blanca's brother.  Ashley responded "why don't you turn off the lights," rolled over, and started going back to sleep.  Five to 10 minutes later, [Rodriguez] again woke Ashley.  This time, [Rodriguez] put his hand on Ashley's shoulder and rolled her onto her back.  [Rodriguez] asked whether the boy with whom Ashley often hung out was her boyfriend.  Ashley responded that the boy was not her boyfriend.  [Rodriguez] then asked if she "had ever done anything sexual before" and kissed her cheek.  Ashley was scared.

[Rodriguez] climbed on top of Ashley and put his hand over her mouth.  Ashley tried to kick him, but she was unable to move.  [Rodriguez] was much larger than she was, and she felt overpowered.  [Rodriguez] told her that if she was loud, he would hurt her.  Ashley believed him.

[Rodriguez] pulled Ashley's pants and underwear off before unbuttoning his own pants.  Ashley was unable to get her pants back on.  [Rodriguez] touched Ashley's vagina with his fingers.  He then pulled his pants to his knees and inserted his penis into her vagina.  Over the next two minutes, [Rodriguez] inserted his penis three or four times.  Ashley testified that "it hurt a lot."  [Rodriguez] also kissed her on the lips.  He then threatened that if she reported what happened, he would hurt or kill her.  Ashley believed him.

[Rodriguez] got up and went to the bathroom for about 20 minutes before leaving the apartment.  During this time, Ashley pretended to be asleep.  After checking that [Rodriguez] had really left, Ashley woke up Antonia.  Ashley said that she did not feel comfortable and called her father.  Fearing [Rodriguez], Ashley did not tell Antonia what had happened.

Ashley's father had just been released from custody following his arrest for driving under the influence.  Her father came over to walk Ashley home.  For fear of [Rodriguez], Ashley also did not tell her father what happened.

At home, Ashley found her underwear was spotted with blood.  She threw the underwear away so her mother would not see it.

The next day, Ashley saw [Rodriguez] but said nothing to him.  Other than her friend, Marcello, Ashley did not tell anyone about what had happened.

In June 2007, Ashley left her house after an argument with her father.  About two hours after she left the house, she spoke with a police officer.  During the conversation, Ashley "felt that [she] needed to deal with it" and told the officer about [Rodriguez] raping her years earlier.  She testified, "I didn't know until a few years after it happened how to say it to someone and then I thought that it would be too late to say something; but I said something later because I was just sick of, you know, people saying all these things that weren't true about me."  Ashley was uncomfortable with a physical sexual examination and refused to submit to one.

In March 2008, Sacramento County Sheriff's Detective Anthony Saika interviewed [Rodriguez].  After initially denying that he knew the victim, [Rodriguez] admitted touching Ashley's inner thigh near her vagina.  [Rodriguez] "said something

came over him and he decided to touch her, and he touched her inner thigh for approximately one to two minutes." Ashley woke up and began to cry. [Rodriguez] said "it's not like I got on top of her and covered her mouth." (Italics omitted.) The detective had not told [Rodriguez] about Ashley's allegation that he had done those things.

Anthony Urquiza, Ph.D., a licensed psychologist, testified as an expert on [Child Sexual Abuse Syndrome ("CSAAS")]. Dr. Urquiza noted that he was not rendering an opinion about whether a particular child was molested or whether a particular individual perpetrated an act of child molestation. The witness further noted that he had not interviewed Ashley or reviewed the police reports in the case.

Dr. Urquiza explained that CSAAS "is a means to describe what commonly or typically happens with a child who has been sexually abused and to dispel any misunderstanding, misconceptions that therapists would have." To that end, CSAAS describes five categories of behaviors commonly engaged in by victims of child sexual abuse: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation. CSAAS is not a diagnostic tool and does not predict that every victim of child sexual abuse will exhibit all five categories of reactions.

Dr. Urquiza explained that the general public has "some misperceptions" about child sexual abuse. This is because "[m]ostly what people hear tends to be the more sensationalistic things that hit the media or newspaper or some television show."

On cross-examination, Dr. Urquiza acknowledged that false allegations of sexual abuse do occur. He also admitted that CSAAS is premised on the assumption that persons who report being sexually abused as a child are telling the truth.

*Defense Evidence*

Ashley's father testified that he did not recall anything unusual about her when walking her home from the sleepover. She did not mention anything about what had happened. And, Ashley did not appear to behave unusually the next day either.

Ashley's friend, Antonia, testified that she asked Ashley why she suddenly wanted to go home from the sleepover. Ashley replied that she just wanted to go home. Antonia did not observe anything unusual about Ashley that night or the next day at school. Ashley did not stop coming over.

Blanca testified that she and Ashley remained friends until Ashley moved away from the apartment complex several months after the sleepover. Blanca did not notice anything different about Ashley after the sleepover.

[Rodriguez] testified on his own behalf, acknowledging that he initially lied to the detective about knowing Ashley. [Rodriguez] also stated that he lied about his initial denials about touching Ashley on the night of the sleepover. [Rodriguez] explained that he lied because he was afraid of going to jail. [Rodriguez] admitted telling Detective Saika that he believed a person who had sexual intercourse with a child would be punished by 10 years' imprisonment, but that a person who only touched the thigh of a child would be sentenced to 2 years.

[Rodriguez] stated that he only rubbed the victim's thigh "close to her vagina" for one or two minutes. [Rodriguez] admitted feeling "[a]ttracted to her." [Rodriguez]

3

testified that he touched Ashley's clothed thigh, contradicting an earlier statement to the detective that he might have touched her bare leg.  Near the end of the interview with the detective, [Rodriguez] said that he would "come clean" but needed to go home and talk with his family first.  To this, [Rodriguez] added: "I am not ending this at all.  I will come back.  I will tell you the truth, what really happened."

Upon conclusion of trial, a jury convicted Rodriguez of aggravated sexual assault (rape) of a minor under the age of 14 and more than 10 years younger than defendant as well as 3 counts of forcible lewd and lascivious acts on a child under the age of 14 years.  The trial court sentenced Rodriguez to an indeterminate prison term of 15 years to life and a determinate prison term of 6 years.  The Court additionally imposed, among other fines and fees, a $242.29 jail booking fee and a $27.22 jail classification fee.

Through counsel, Rodriguez appealed his conviction, arguing that: 1) counsel was ineffective for failing to object to the admission of CSAAS expert testimony; 2) the trial court erred in instructing the jury it could consider CSAAS evidence in assessing witness believability; 3) CSAAS should be "inadmissible per se in California"; 4) the trial court violated his confrontation rights when it precluded him from cross-examining the victim about an earlier lie to the police; 5) the court failed to give an instruction in compliance with *People v. Dewberry*, 334 P.2d 852 (Cal. 1959),[2] 6) the cumulative effect of the errors committed warranted reversal; 7) the term imposed on Count 2 should have been stayed because it was imposed for the same course of conduct underlying Count 1 and thus prohibited by California Penal Code § 654;[3] and

---

[2]     In *Dewberry*, the California Supreme Court held that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense."  334 P.2d at 856.

[3]     That section provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the

8) the imposed jail booking and classification fees must be reversed because there was insufficient evidence to establish that Rodriguez could pay or that the county actually incurred that amount.  On February 22, 2011, the Court of Appeal issued a reasoned, unpublished opinion modifying the judgment to stay his sentence on Count 2 but otherwise affirming his convictions in their entirety.  Again proceeding through counsel, Rodriguez petitioned for review to the California Supreme Court, asserting the unsuccessful claims he raised to the Court of Appeal. The Supreme Court denied the petition for review without comment on June 8, 2011.

Rodriguez then filed a *pro se* petition for a writ of habeas corpus to the state supreme court.  He claimed that both his trial and appellate counsel were ineffective for failing to argue that there was insufficient evidence to sustain the verdict and for failing to conduct a pre-trial investigation into "police abuse for tampering with DNA evidence and coersion [sic]."  The court denied the habeas petition without comment on June 13, 2012.  Rodriguez timely filed a Petition for a Writ of Habeas Corpus to this Court on July 18, 2012.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Rodriguez asserts the following nine grounds for relief: 1) trial and appellate counsel were ineffective for failing to raise a sufficiency of the evidence claim; 2) trial and appellate counsel were ineffective for failing to perform a pre-trial investigation into "alleged police abuse"; 3) trial counsel was ineffective for failing to object to the admission of expert testimony on CSAAS; 4) he was denied due process when the jury was instructed to use CSAAS as evidence; 5) CSAAS evidence should be inadmissible in California; 6) his right to

---

longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654(a).

confrontation was violated when the trial court would not allow him to cross-examine the victim "as to her admitted lies" to the police; 7) the trial court erred in failing to instruct the witness in compliance with *Dewberry*; 8) the cumulative effect of the errors deprived him of due process and a fair trial; and 9) there was insufficient evidence to sustain the trial court's order to pay booking fees. Rodriguez also requests an evidentiary hearing on his first and second claims.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

1.     Ineffective Assistance of Counsel Claims (Claims 1 and 2)

    A.     *Strickland Standard on Habeas Review*

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a

reasonable probability that the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

393-95.  Thus, Rodriguez must show that defense counsel's representation was not within the

range of competence demanded of attorneys in criminal cases, and that there is a reasonable

probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill

v. Lockhart,* 474 U.S. 52, 57 (1985).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because
> the *Strickland* standard is a general standard, a state court has even more latitude
> to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.

Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland*

claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v.

Gentry*, 540 U.S. 1, 5-6 (2003)).

B.    *Failure to Allege Sufficiency of the Evidence*

Rodriguez first argues that his trial and appellate counsel were ineffective for failing to

argue that his convictions for aggravated sexual assault and one of the forcible lewd and

lascivious acts counts were unsupported by legally sufficient evidence.  Rodriguez raised this claim in his state habeas petition, which was summarily denied.

This Court cannot find deficient performance by either trial or appellate counsel because there was sufficient evidence to support jury verdicts on both counts.  As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  In this case, the victim's testimony established the components of the alleged offenses.  Under California law, the victim's testimony was sufficient evidence for Rodriguez's convictions.  *See* CALCRIM No. 1190 ("Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone.").

Rodriguez contends that the victim's testimony was largely fabricated.  But "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).  Rodriguez also asserts in this claim that trial counsel was ineffective for failing to cross-examine the victim regarding her sexual relations with an adult boyfriend.  However, the record indicates that trial counsel attempted to cross-examine the victim as to this issue but that the trial court properly prohibited the request under California's Rape Shield Law.

Rodriguez likewise contends that it was implausible that the abuse could have occurred because his cousin was in the room at the time.  But the Ninth Circuit has found reasonable under *Jackson* a state court's determination that a sexual assault conviction was supported by legally

sufficient evidence where the victim was allegedly molested while sleeping in bed with several other children.  *See Bruce*, 376 F.3d at 957-58.

Because Rodriguez fails to advance any arguments that would allow this Court to find that the challenged convictions were not supported by legally sufficient evidence, Rodriguez cannot show that either of his counsel were ineffective for making these arguments.  *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1434-35 (9th Cir. 1989) (appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).

C.    *Failure to Argue that Confession was Coerced*

Rodriguez next argues that his trial and appellate counsel were ineffective for failing to perform a "pre-trial investigation" as to Rodriguez's "alleged police abuse."  The essence of Rodriguez's claim appears to be that his trial counsel should have moved to exclude his admission on the ground that it was coerced and that his appellate counsel was ineffective for failing to raise this issue on appeal.  Rodriguez also raised this claim in his state habeas petition, which was summarily denied.

At trial, Detective Anthony Saika testified on direct examination as follows:

Q      Prior to leaving the interview room, did you say anything to [Rodriguez]?
A      Yes.
Q      What did you say?
A      I posed two questions to him because we were talking about Ashley and her allegations and I said, is there—the first question was: Is there any reason why

Ashley would specifically pick you out of a line-up and say that you are her perpetrator?

And question No. 2 was: Is there any reason why your DNA would be found on her body or clothing?

Q     What was the [Rodriguez's] response?

A     He said no.

Q     Had there been DNA evidence collected from Ashley's body or clothing?

A     No.

Q     How would you characterize your comment to the defendant about DNA being found?

A     I used what is called a rouse.

Q     Have you received training as part of your job as a detective in the Child Abuse Unit on how to conduct interviews and interrogations?

A     Yes.

Q     As part of your training, are you given instruction on the use of a rouse?

A     Yes.

Q     Can you explain to the jury what that entails?

A     A rouse is like – it's a tool that investigators use to elicit a possible confession from a suspect.  Oftentimes suspects are not going to tell you.  They are not going to come right out and admit guilt.

As an investigator, this is a tool we use.  We have one shot sometimes to interview a suspect, and they are not always truthful.

I like to compare the use of a rouse—well, let's back up.

I will give you some examples of a rouse besides this example here.  It is like you have two suspects in a crime, and you have got one suspect in one interview room and you have another suspect in another interview room.

You have two suspects and you go to one suspect and tell them your co-defendant, your friend, is now ratting you out; and he is telling us everything so now is your opportunity.

That is one example we can use.

Another example is telling a suspect we found your fingerprints on a counter of a burglary; and he denies everything and so getting back to what I like to compare this to, I like to compare an interview and interrogation as a game of poker.

I am not going to show my complete hand to a suspect I am interrogating or interviewing.  I am not going to show him my entire hand and at times I may bluff.

I may use some type of trick or device and sometimes a suspect, he is going to call my bluff.  He is not going to say anything, and he is going to stick to his story and that's it.

The second part of that is, or the suspect, he is going to fold his hand.  He is going to tell me a little bit about what he did.  He is not going to tell me everything, you know.

11

There is an array of things that a suspect may tell you as part of his confession. I have seldom had an experience where they have told me everything.

Q      Detective Saika, when you employed this rouse, after you did, did you leave the interview room?

A      Yes.

Q      When you left the interview room, is the interview still being videotaped?

A      Yes.

Q      What did you do when you left the room?

A      Went to the monitoring room where I could still see Mr. Rodriguez in the interview room.

Q      What did you see him do in the interview room?

A      He was rubbing his face and he said the words, "Jesus Christ."

Q      Now, did you then go back inside the room and start your interview again.

A      Yes.

Q      When you went back into the interview room, did you continue to ask [Rodriguez] about Ashley and anything that may have happened in the apartment?

A      Yes.

Q      What did he tell you?

A      He first denied anything again, that he didn't know her, didn't know who she was and then he subsequently said that he remembered her now and had gone into the living room where she was at and placed a blanket on her.

Q      Did you then ask [Rodriguez] what happened when he placed the blanket on Ashley?

A      Yes.

Q      What did he tell you?

A      He said after he placed a blanket on Ashley, she woke up scared and he apologized to her.

Q      Did [Rodriguez] at that point in the interview admit touching Ashley in an inappropriate manner?

A      No.

Q      Did you employ a second rouse during that interview?

A      Yes.

Q      What was the second rouse?

A      The first question before the break was: Is there any reason why your DNA may be found on her clothing or body?
       To follow up with that, I asked him—I mean, I told him that there was DNA evidence; and I asked him if he would submit to what's called buccal swabs to obtain your saliva, the DNA off your saliva from your mouth.

Q      When you asked [Rodriguez] if he was willing to do that, what was his response?

A      He was—consented to having his mouth swabbed for DNA. I'm sorry.

Q      Later in the interview. Did [Rodriguez] say anything else about his interactions with Ashley that evening?

12

A       After the interview progressed—this interview took, I want to say, approximately two and-a-half hours.  You know, it went from, *I don't know Ashley, I don't know who she is.  I don't recognize her photo* to then it went to *okay.  I know her.  I remember that night.  I was—I was in the living room and placed a blanket on her*.
And then as we were talking and I was trying to appeal to his personal side of this incident, he said that, okay, he touched her inner thigh.

The Due Process Clause forbids the use of a defendant's confession if it is obtained through police coercion.  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936).  "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege."  *Colorado v. Spring*, 479 U.S. 564, 573 (1987).  A confession is involuntary if coerced "either by physical intimidation or psychological pressure."  *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (citation omitted).  The question is therefore whether the police used coercive activity to undermine the suspect's ability to exercise his free will.  *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990); *see also Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (confession was coerced where there was a credible threat of physical violence if defendant did not confess)*; Henry v. Kernan*, 197 F.3d 1021, 1026-27 (9th Cir. 1999) ("The test of voluntariness is well established: 'Is the confession the product of an essentially free and unconstrained choice by its maker?'" (citation omitted)).

"Misrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary."  *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997) (misrepresentation to suspect that he had been identified did not make confession coerced); *see also Frazier v. Cupp*, 394 U.S. 731, 737-39

13

(1969) (confession voluntary even though officer falsely told suspect his co-conspirator had

confessed).  As the Ninth Circuit has noted:

> [T]rickery is not automatically coercion.  Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect.  While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations.

*Crawford*, 372 F.3d at 1061.

In this case, Rodriguez claims that trial counsel was ineffective for not moving to exclude

his confession to the police that he touched the victim on her inner thigh.  But in his Petition

Rodriguez admits the "inappropriate touching of Ashley T." and "concedes . . . [the lewd and

lascivious acts charges], as he confessed to the police detective conducting [h]is initial interview

that [h]e felt bad for touching Ashley T. on [h]er thigh and inner parts of [h]er legs."  Because he

does not claim that the confession was false, Rodriguez cannot prove that his admission to the

police should have been suppressed.  *See People v. Chutan*, 85 Cal. Rptr. 2d 744, 747 (Cal. Ct.

App. 1999) ("So long as a police officer's misrepresentations or omissions are not of a kind

likely to produce a false confession, confessions prompted by deception are admissible in

evidence.  Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person

into confessing.  The cases from California and federal courts validating such tactics are legion."

(internal citations omitted)).  Consequently, Rodriguez cannot show that his trial counsel was

ineffective for failing to move for suppression, *see Lockhart*, 506 U.S. at 374, or that his

appellate counsel was ineffective for failing to argue it on appeal, *see Jones*, 463 U.S. at 751-52;

*Miller*, 882 F.2d at 1434-35.  Rodriguez thus cannot prevail on these ineffective assistance of

counsel claims.

D.    *Evidentiary Hearing*

Rodriguez also requests that this Court grant him an evidentiary hearing on these two ineffective assistance claims.  Rodriguez fails, however, to specify what evidence he wishes to present for each claim.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670

(quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Rodriguez has failed to assert a colorable claim for relief as to either of these claims. Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts, he also has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2). Accordingly, Rodriguez's request for an evidentiary hearing on these claims also must be denied.

2.      CSAAS Claims (Claims 3, 4, and 5)

Rodriguez additionally brings a number of claims relating to the trial court's admission of CSAAS evidence. In general, CSAAS "describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse." *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003).

Rodriguez argues in claim 5 that CSAAS "should be inadmissible as it is in many other states of the land, as it does not find whether the alleged victim has been sexually abused." Although Rodriguez recognizes that California law admits CSAAS evidence for certain limited purposes, he urges this court to break with such authority and to change California law to follow the rule in other states and jurisdictions that such CSAAS evidence is "inadmissible for any purpose." Although California courts have recognized the problems identified by Rodriguez and other states regarding CSAAS evidence, *see People v. Patino*, 32 Cal. Rptr. 2d 345, 349 (Cal. Ct. App. 1994); *People v. Housley*, 8 Cal. Rptr. 2d 431, 438 (Cal. Ct. App. 1992), those courts have also found such evidence to be constitutionally permissible with proper admonishments to the

jury regarding the limits of such evidence, *Patino*, 32 Cal. Rptr. 2d at 349; *Housley,* 8 Cal. Rptr.

2d at 439.

Moreover, the Ninth Circuit has noted that expert testimony about CSAAS has been

admitted "in federal child-sexual-abuse trials, when the testimony concerns general

characteristics of victims and is not used to opine that a specific child is telling the truth."

*Brodit*, 350 F.3d at 991 (citing *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) (per

curiam); *United States v. Antone*, 981 F.2d 1059 (9th Cir.1992)).  The Ninth Circuit has found

that this type of general testimony "merely assist[s] the trier of fact in understanding the

evidence; it [does] not improperly bolster the particular testimony of the child victim."  *Antone*,

981 F.2d at 1062.  In *Brodit*, a habeas case involving a similar claim, the Ninth Circuit found that

where the trial court instructed the jury that expert testimony concerning CSAAS could not be

considered as proof that the sexual abuse occurred, the petitioner did not assert a violation of

clearly established federal law in the admission of the testimony.  *Brodit*, 350 F.3d at 991.  Prior

to deliberations, the trial court made the proper admonishments here:

> You have heard testimony from Anthony Urquiza regarding child sexual abuse
> accommodation syndrome.
> Anthony Urquiza's testimony about child sexual abuse accommodation syndrome
> is not evidence that [Rodriguez] committed any of the crimes against him.
> You may consider this evidence only in deciding whether or not Ashley T.'s
> conduct was not inconsistent with the conduct of someone who has been molested, and in
> evaluating the believability of her testimony.

Because Urquiza's expert testimony was not admitted to prove the ultimate question of

Rodriguez's guilt, Rodriguez cannot show that its admission violated clearly established federal

law.  *Brodit*, 350 F.3d at 991.  And because the California law fully comports with federal law on

this point, this Court cannot say that CSAAS evidence should be per se inadmissible in

17

California.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (A "state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Rodriguez likewise argues in claim 3 that his trial counsel was ineffective for failing to object to the admission of the CSAAS evidence.  Rodriguez argues in his Petition, as he did on direct appeal, that the only category of CSAAS evidence relevant in his case concerned the victim's delay in reporting the crime.  The appellate court rejected this claim on direct appeal, concluding that CSAAS evidence was relevant with respect to four of its five categories:

> *Delayed Disclosure*
> Ashley did not report the rape for approximately five years until she spoke to a police officer after walking out on an argument with her father.  As [Rodriguez] acknowledges, CSAAS evidence regarding delayed disclosure was relevant in explaining that victims of childhood sexual abuse often wait years before reporting the crimes.

> *Secrecy*
> Ashley did not tell her father or Antonia of the rape on the night that it occurred. Neither did she tell anyone else, other than her friend Marcello, about the rape for several years.  Thus, testimony regarding secrecy was relevant.  To be relevant, evidence does not need to be overwhelming or even strong.  Instead, evidence is relevant and admissible so long as "'it tends to prove the issue before the jury.'"  Thus, Dr. Urquiza's testimony regarding victims' secrecy about childhood sex abuse was relevant and admissible.

> *Helplessness*
> During the attack, Ashley was overpowered by [Rodriguez].  Following the attack, she believed [Rodriguez's] threats that he would hurt or kill her if she told anyone about the rape.  Ashley testified that [Rodriguez's] threats effectively discouraged her from immediately reporting the rape.  Thus, Dr. Urquiza's testimony regarding the helplessness category of CSAAS was relevant and admissible.

> *Entrapment and Accommodation*
> This category refers to the tendency of a victim of child sexual abuse to shut down feelings regarding the molestation.  Here, the evidence showed that Ashley's father, Antonia, and Blanca all failed to observe any unusual behavior by Ashley following the attack.  Evidence regarding the common method of coping by victims in the form of

ignoring and hiding their feelings about the attack was therefore relevant and admissible in this case.

*Retraction*

Retraction represented the only category of reactions described by CSAAS that was not exhibited by Ashley.  However, the testimony regarding recantation by a small percentage of child sexual abuse victims was brief—encompassing only a single question and answer.  Any error in the admission of this small amount of noninflammatory evidence was harmless.

The determination by the state appellate court that CSAAS evidence was relevant to four of the five CSAAS categories and that admission with regard to the fifth category was harmless error neither contravenes or unreasonably applies federal law.  Rodriguez's counsel therefore could not have been ineffective for failing to object to the admission of the CSAAS evidence to the four categories because doing so would have been futile or without consequence.  *See Lockhart*, 506 U.S. at 374.

Finally, Rodriguez contends in claim 4 that the trial court erred in instructing the jury with CALCRIM No. 1193.  Rodriguez asserts that the instruction improperly bolstered the victim's credibility and "denied [him of] his right to have each element of each charge proven true beyond a reasonable doubt."  But as discussed *supra*, that instruction, set forth above, meets the requirements under California case law that the admission of CSAAS evidence be accompanied by a limiting instruction informing the jury that the expert's testimony should not be used to determine whether the victim's molestation claim is true, but only to decide whether the victim's reactions are consistent with having been molested.  *See Patino*, 32 Cal. Rptr. 2d at 349; *Housley,* 8 Cal. Rptr. 2d at 439.  This limiting instruction also ensured that the jury considered the CSAAS evidence as required by *Brodit*, 350 F.3d at 991.  Thus, the jury

instruction, rather than violating Rodriguez's constitutional rights, protected his rights by properly limiting the jury's use of the CSAAS evidence.

Rodriguez nonetheless argues that the instruction violated his due process rights because it "erroneously instructed [the jury] that it could use the evidence of CSAAS in assessing her believability as a witness."  However, because Rodriguez put the victim's credibility in issue, it was permissible for the jury to use this evidence to evaluate her credibility.  *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991); *see also People v. McAlpin*, 812 P.2d 563, 569 (Cal. 1991) (CSAAS evidence permissible to rehabilitate witness's credibility when it has been questioned by defendant).  Rodriguez has failed to show that the given instruction was undesirable, erroneous, universally condemned, or that it violated a constitutional right.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Accordingly, Rodriguez cannot prevail on any of his CSAAS claims.

3.     Confrontation Claim (Claim 6)

Rodriguez likewise asserts that the trial court violated his rights to confrontation and to present a defense when it refused to allow him to cross-examine the victim about lying to the police that she was a virgin.  On direct appeal, the appellate court recounted the following facts underlying this claim:

> Prior to trial, defense counsel moved to impeach Ashley with a statement to the police—made at the time she first reported the rape by [Rodriguez]—to the effect that she was a virgin.  The following colloquy ensued:
>
> "THE COURT: [¶] . . . [¶] Let me ask you, Mr. Ruiz [defense counsel]: What specifically are you proposing to do if the Court gives you permission?
> "MR. RUIZ: Ask the victim in this case why she lied to law enforcement about not being a virgin when she was asked that question; and she responded initially with, yes, I am a virgin.  [¶] She later told Detective Saika—I believe it was—that,

20

in fact, she lied about that, that she, in fact, was not a virgin so that was the lie that she told law enforcement.  I think that's important.

"THE COURT: What is the answer that you expect to elicit when you ask her why she lied?

"MR. RUIZ: Oh, I believe her answer to the detective was that she had other boyfriends that were over the age of 18 and somehow, I think by implication, she wanted to protect them."

The prosecutor objected to the proposed cross-examination, arguing that the defense had not filed a written motion as required by Evidence Code section 782[FN1] and that the sexual conduct of the victim was irrelevant and unduly prejudicial.

> FN1. Evidence Code section 782 provides, in pertinent part: "(a) . . . [I]f evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness under Section 780, the following procedure shall be followed: [¶] (1) A written motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness. [¶] (2) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated.  The affidavit shall be filed under seal and only unsealed by the court to determine if the offer of proof is sufficient to order a hearing . . . ."

The prosecution then stated its intent to elicit testimony that Ashley reported the rape without reference to the fact that she made the disclosure to the police after getting into an argument with her father about her virginity.  Defense counsel objected: "I think we are getting into an area where I am not going to be able to effectively cross-examine this alleged victim, Your Honor."  Defense counsel argued "what prompted that argument [between Ashley and her father] is, in part, the reason why she made up many of these allegations against [Rodriguez]."

The court allowed evidence to be presented regarding the argument between Ashley and her father, including the fact that Ashley's father accused her of not being a virgin.  However, the court excluded evidence regarding her lie to the detective about being a virgin.  In so ruling, the trial court explained "that does implicate [Evidence Code section] 782, risk of confusion of issues.  It has less probative value, in that she did eventually disclose the sexual conduct.  [¶] So I think the probative value is greatly undercut by her admission that she had sexual contact with a boyfriend over the age of 18."

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him . . . ."  U.S. CONST. amend. VI.  It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).  States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v.*

*Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination. The first inquiry is whether the evidence is relevant. *See id*. at 1550. If the evidence is relevant, the next inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the evidence. *See id*. In *Wood*, the Ninth Circuit explained that there will not be a Sixth Amendment violation "so long as the jury has 'sufficient information' upon which to assess the credibility of a witness." *Id*. (citation omitted).

Under these guidelines, this Court cannot find that the trial court's restriction on the proposed cross-examination was either unreasonable or contrary to federal law. *See Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) ("Evidence of little importance, whether merely cumulative or of little probative value, will almost never outweigh the state interest in efficient judicial process."). As the appellate court concluded:

> Here, the trial court did not err in concluding that the victim's possible history of sex with boyfriends did not have any relevance to the question of whether defendant raped her years earlier. The trial court noted that Ashley's initial lie to the police did have some minimal relevance with respect to her credibility, but that delving into the issue was more prejudicial and confusing than probative. And, as the trial court noted, Ashley's retraction of her initial lie to the police and explanation for why she lied further undercut the probative value of the cross-examination proposed by the defense.

The Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), does not compel a different conclusion. In *Davis*, the petitioner had been convicted of grand larceny and burglary following a trial in which the trial judge prevented defense counsel from cross-examining a key witness concerning his adjudication as a juvenile delinquent relating to a burglary and his

23

probation status at the time of the events.  *Davis*, 415 U.S. at 309-11.  Defense counsel sought to

introduce the witness's juvenile record on cross-examination not as a general impeachment of the

witness's character but rather to show bias and prejudice against the defendant because the

witness, who was then on probation, might have identified the defendant out of fear or concern

that the police might believe he had committed the crime in issue, thereby jeopardizing his

probation.  *Davis*, 415 U.S. at 311.  Following the affirmance of petitioner's convictions by the

Alaska Supreme Court, the United States Supreme Court reversed and remanded, holding that

the jurors were entitled to have the benefit of the defense theory before them so that they could

make an informed judgment as to the weight to place on the witness's testimony.  *Id.* at 317.  In

particular, the court ruled that counsel should have been permitted to ask the witness not only

"whether he was biased," but also "why [he] might have been biased or otherwise lacked that

degree of impartiality expected of a witness at trial."  *Id*. at 318.  The *Davis* Court emphasized

that "the exposure of a witness' motivation in testifying is a proper and important function of the

constitutionally protected right of cross-examination."  *Id.* at 316-17.

       The proffered evidence here, however, does not share the probative value of the evidence

at issue in *Davis*.  As the appellate court noted, "the victim's possible history of sex with

boyfriends did not have any relevance to the question of whether defendant raped her years

earlier ," and thus Rodriguez's contention that her sexual history with other boyfriends motivated

her to fabricate the charges against Rodriguez was pure speculation.  Moreover, the proffered

evidence, unlike the evidence at issue in *Davis*, intrudes on the privacy rights of the victim which

the California legislature has sought to protect through the enactment of the state's Rape Shield

Law.  Therefore the proper question in this case is whether it was "objectively unreasonable" for

the California Court of Appeal to conclude that the trial court struck a proper balance between the privacy of the victim and Rodriguez's Sixth Amendment right to examine the victim's motivation for her testimony.  This Court cannot say that the decision was "objectively unreasonable" given the minimal relevance that the lie had on her credibility.  Accordingly, § 2254(d) of the AEDPA precludes this court from granting habeas relief on this claim.

Furthermore, the denial of a defendant's opportunity to impeach a witness is subject to harmless error analysis.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be quantitatively assessed in the context of other evidence presented to the jury." (citations and internal quotation marks omitted)).  A petitioner is therefore not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Rodriguez cannot satisfy that burden, however, because he fails to show that he was deprived of a fair opportunity to cross-examine and impeach the victim.  The court allowed Rodriguez to cross-examine the victim about her argument with her father—which the defense contended prompted the victim to make up allegations about Rodriguez—including the fact that the victim's father accused her of not being a virgin.  Even assuming that the exclusion of the victim's statement to the police was improper, any purported error would be deemed harmless under these circumstances.  Rodriguez is therefore not entitled to relief on this claim.

4.      Instructional Error (Claim 7)

Rodriguez next argues that the trial court erred by giving the standard CALCRIM

instruction No. 3517 because it "does not convey the *Dewberry* principle to the jury because it

does not address the question of how to choose between the greater and lesser offenses.  The

instruction does not tell the jury that if they have a reasonable doubt as to whether the defendant

committed the greater or lesser offense, they *must* find him guilty of *only* the lesser offense."

The essence of Rodriguez's argument is that the jurors should have been instructed that, if they

had reasonable doubt as to whether Rodriguez committed the lewd and lascivious act with force,

the jury must find him guilty of lewd and lascivious conduct rather than forcible lewd and

lascivious conduct.

The trial court gave the jury the following instruction pursuant to CALCRIM No. 3517:

> If all of you find the defendant is not guilty of a greater crime, you may find him guilty of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime.  A defendant may not be convicted by both a greater and a lesser crime for the same conduct.
> Lewd and lascivious act upon a child under age 14 years is a lesser crime with regard to lewd or lascivious act by force or fear upon a child under 14 years as charged in Count Three.
> It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime.
> For any charge with a lesser crime, you will receive a form for indicating your verdict on both the greater and the lesser crime.  The greater crime is listed first.  When you have reached a verdict, have the foreperson complete the form, sign it, and date it. Follow these directions before writing anything on the form:
> First, if all of you agree that the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime as charged, check the box for guilty for that crime and sign, date, and return the form.  Do not check anything for the lesser crime.
> Two, if all of you cannot agree whether the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime as charged, inform me only that you cannot reach an agreement and do not write anything on the verdict form.

Three, if all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater crime and you also agree that the People have proved beyond a reasonable doubt that he is guilty of the lesser crime, check the box for not guilty for the greater crime and check the box for guilty of the lesser crime. You must not check anything for the lesser crime unless you have checked not guilty for the greater crime.

Four, if all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of either the greater or the lesser crime, check the box for not guilty for both the greater and the lesser crime.

Five, if all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the greater crime but all of you cannot agree on the verdict for the lesser crime, check the box for not guilty of the greater crime and then sign, date, and return the form. Do not check anything for the lesser crime and inform me only that you cannot reach an agreement about that crime.

On direct appeal, Rodriguez argued that the jury should have been instructed:

If you are convinced beyond a reasonable doubt and unanimously agree that the defendant committed a lewd and lascivious act on a child under 14 years of age, but you have a reasonable doubt whether that act was committed by the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child, you must give the defendant the benefit of the doubt and find him not guilty of count 3 and guilty of the lesser offense of non-forcible lewd and lascivious conduct on a child under 14 years of age.

The appellate court rejected the claim, noting that "CALCRIM No. 3517, as given, did not violate the California Supreme Court's decision in *Dewberry* because it did not allow [Rodriguez] to be convicted of any offense for which a unanimous jury failed to agree on his guilt."

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471

27

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at

72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation."  *Id.* at 73 (citation omitted).

Where the defect is the failure to give an instruction, the burden is even heavier because an

omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates

the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is

whether the trial court's refusal to give the requested instruction "so infected the entire trial that

the resulting conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

As an initial matter, the California Supreme Court's decision in *Dewberry* relied entirely

on state law, without any reference to federal constitutional rights.  *See Roa v. Holland*, No.

SACV 12-1986, 2013 WL 2359658, at *9 (C.D. Cal. May 20, 2013) (citing *Dewberry*, 334 P.2d

at 856).  Moreover, the United States Supreme Court has never mandated that federal due process

28

requires a comparable instruction.  Rodriguez's challenge to the jury instruction on the basis of *Dewberry* therefore raises only state law and thus does not state a cognizable federal habeas claim.  *Estelle*, 502 U.S. at 67-68, 71-72 (federal habeas corpus relief is not available for violations of state law or for alleged error in the interpretation or application of state law).

Nor can Rodriguez show that the omission of a *Dewberry* instruction "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  As the appellate court found, "CALCRIM No. 3517 properly instructed the jury to convict [Rodriguez] on the lesser included charge only if it unanimously agreed that he was not guilty of the greater offense but was guilty of the lesser offense."  There is no reasonable likelihood that the jury failed to understand that, if it had reasonable doubt about whether the lewd and lascivious act was forcible or non-forcible, it should find Rodriguez guilty of non-forcible lewd and lascivious conduct.  It must be presumed that the jury followed its instructions and found that Rodriguez had committed a forcible lewd and lascious act on a child under 14 years of age because it found, beyond a reasonable doubt, that the prosecution had proved that Rodriguez used force in the act. *See Weeks*, 528 U.S. at 234.  Moreover, CALCRIM No. 3517 contains similar content to CALJIC No. 17.10, which California courts have found to comply with *Dewberry*.  *See Roa*, 2013 WL 2359658 at *9 (citing *People v. Barajas*, 15 Cal. Rptr. 3d 858 (Cal. Ct. App. 2004)). Rodriguez's jury instruction claim therefore must fail.

Construing Rodriguez's *pro se* Petition liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), this Court may discern that Rodriguez's Petition additionally alleges that the instruction as given violated his federal constitutional rights because the standard instruction required the jury to acquit Rodriguez of the greater offense before reaching a verdict on the lesser

offense.  In a case arising on direct review of a federal criminal prosecution under 28 U.S.C.

§ 2255, the Ninth Circuit has held that where a defendant expresses no preference between a

strict "acquittal first" instruction, requiring a jury to acquit on the greater charge before

considering the lesser included charge, and a "disagreement instruction," directing the jury to

consider the lesser included charge if unable to reach a verdict on the greater offense, a district

court may give either instruction.  *United States v. Jackson*, 726 F.2d 1466, 1469 (1984) (per

curiam) (noting that "either form [of instructions] may have advantages and disadvantages for the

defendant").  The *Jackson* court held, however, that a "disagreement instruction" should be given

if requested because such an instruction avoids the risk that a jury will resolve doubts in favor of

conviction. *Id.* at 1469-1470.

In this case, the jury was instructed, "It is up to you to decide the order in which you

consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser

crime only if you have found the defendant not guilty of the corresponding greater crime."

Unlike the instruction in *Jackson*, the California instructions at issue here did not preclude

consideration of the lesser charges until the jurors unanimously decided to acquit Rodriguez of

the greater charges.  The instructions only required the jury to acquit Rodriguez of the greater

offenses before returning a guilty verdict on the lesser included offenses.  Thus, the jury

instructions did not preclude the jury's consideration of the lesser included offenses or give the

prosecution an unfair advantage.  There is therefore no basis for finding that the instruction as

given violated Rodriguez's due process right to a fair trial.  In any event, the United States

Supreme Court has never held that an  "acquittal first" instruction such as California's is

unconstitutional and so it cannot be said that the instructions as given violated any clearly

established Supreme Court precedent. *See Brewer v. Hall*, 378 F.3d 952, 955-956 (9th Cir. 2004) (California appellate court's decision rejecting due process challenge to jury instruction "was not contrary to or an unreasonable application of clearly established Supreme Court precedent, because no Supreme Court case establishes that an instruction such as [the instruction in question] violates an existing constitutional right"). Rodriguez therefore cannot prevail on any claim that the jury instruction violated his due process rights.

5.      Cumulative Error (Claim 8)

Rodriguez next argues that the "cumulative effect of the errors" denied him due process and a fair trial.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

As discussed above, Rodriguez does not allege any claims that amount to errors of constitutional dimension. Accordingly, he demonstrates no errors that can accumulate to a level of a constitutional violation, and the state courts therefore did not unreasonably deny him relief on this claim. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

6.      Erroneous Imposition of Booking Fees (Claim 9)

Finally, Rodriguez contends that "[t]he fees imposed here should be stricken because there is insufficient evidence to support an implied finding that [Rodriguez] had the ability to pay the fees; and, there is no sufficient evidence that the amount of the fees imposed actually reflects the costs incurred by the county."

A petition for a writ of habeas corpus can be entertained only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a habeas corpus petition raising an in-custody challenge to a restitution order."  *Bailey v. Hill*, 599 F.3d 976, 984 (9th Cir. 2010) (footnote omitted).  "[T]he remedy that [Petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact—and is not directed at the source of the restraint on—his liberty."  *Id*. at 981.  Moreover, Rodriguez's claim that the restitution order was unauthorized by California law is a state-law claim which is beyond the purview of this Court in a federal habeas proceeding.  *Swarthout*, 131 S. Ct. at 863; *see also Bell v. Cone*, 543 U.S. 447, 455 (2005).  Rodriguez is therefore not entitled to relief on this claim.

### V. CONCLUSION AND ORDER

Rodriguez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 28, 2014.

_____/s/James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
Senior United States District Judge